**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CINDY L. BILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-35 |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Cindy Biller ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). This matter comes before the Court on cross-motions for summary judgment. (Docket Nos. 12; 14). The record has been developed at the administrative level. (Docket No. 7). For the following reasons, Plaintiff's Motion for Summary Judgment [12] is granted, in part, and denied, in part, and Defendant's Motion for Summary Judgment [14] is denied.

### II.  PROCEDURAL HISTORY

Plaintiff applied for DIB on May 6, 2009, claiming a disability onset of October 1, 2008. (R. at 112).[2] She was initially denied benefits on August 20, 2009. (R. at 86). Per the request of Plaintiff, another administrative hearing was held on February 3, 2011. (R. at 47, 91). At this

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.

[2] Citations to the Record, *hereinafter*, "R. at __."

second hearing, she was represented by counsel and gave testimony. (R. at 51-52). A neutral vocational expert also testified. (R. at 52-83). In a decision dated June 14, 2010, the ALJ denied her application for benefits. (R. at 10-25). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, but this request was denied on July 6, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1, 5).

Plaintiff filed a Complaint in this Court on January 8, 2013. (Docket No. 3). Defendant responded with her Answer on March 15, 2013. (Docket No. 6). Cross-motions for summary judgment followed. (Docket Nos. 12; 14). The matter has been fully briefed and is ripe for disposition. (Docket Nos. 13; 15; 16; 17).

**III. STATEMENT OF FACTS**

A. General Background

Plaintiff was born on September 28, 1955 and was fifty-five years of age at the time of the administrative hearing. (R. at 52). She graduated high school and completed one year of college. (R. at 143). According to her testimony at the hearing, she was previously employed as a cashier and clerk in a drugstore and as a clerk and lottery machine attendant at a grocery store. (R. at 52, 58). On her Disability Report, Plaintiff also indicated that she had also worked as a cashier and pizza maker in a ski resort. (R. at 137).

When Plaintiff applied for DIB, her daily routine consisted of taking medication, walking her dog, cooking meals, watching television, cleaning her home, readying her husband's clothes for work, making coffee, and sometimes doing laundry. (R. at 157). She was able to walk, feed, and bathe her pets when necessary; however, she indicated that "it's all very hard and painful." (R. at 158). Although difficult, Plaintiff "force[d]" herself to do some outside work, like gardening and mowing. (R. at 159). Plaintiff also took her mother shopping once a week "when

2

able." (R. at 158). Writing, peeling potatoes, bending over, concentrating, and using her hands for long periods of time, however, were all beyond her capabilities. (*Id.*). She also complained about her breathing problems, anxiety, neck pain, and numbness in various areas. (R. at 158, 160). Plaintiff was able to provide for her own personal care with some difficulty, and she indicated that she was able to walk without an assistive device. (R. at 158, 163). Notably, however, she walked with a cane at the hearing. (R. at 60).

B. Medical History

In Plaintiff's Motion for Summary Judgment to this Court, she claimed the ALJ found that she suffered from eighteen severe medical impairments. (Docket No. 13, at 4). These impairments consist of degenerative disc disease,[3] degenerative arthritis,[4] spondylosis[5] of the cervical spine, spondylosis of the thoracic spine, spondylosis of the lumbar spine, left rotator cuff tendinosis,[6] mild bilateral carpal tunnel syndrome,[7] mild to moderate mitral valve regurgitation,[8]

---

[3] Spinal discs cushion the spine's vertebrae, allowing it to move, bend, flex, and twist. Degenerative Disc Disease, UPMC, http://www.upmc.com/services/neurosurgery/spine/conditions/degenerative/pages/degenerative-discdisease.aspx. Degenerative disc disease occurs when spinal discs wear down. *Id.*

[4] Degenerative arthritis, also called osteoarthritis, is characterized by erosion of joint cartilage, causing it to become soft, frayed, and thinned. STEDMAN'S MEDICAL DICTIONARY 1388 (28th ed. 2006). Degeneration of the bone, spur growth, pain, and loss of function result. *Id.* This condition usually affects weight-bearing joints, and is more common in the elderly. *Id.*

[5] Spondylosis is a stiffening or fixation of the vertebra, resulting from disease, with fibrous or bony growth across the joint. STEDMAN'S MEDICAL DICTIONARY 95, 1813 (28th ed. 2006).

[6] Tendinosis is caused by small tears and frays in tendon tissue that never fully heal, and therefore cause deterioration. Jim Thornton, AARP The Magazine, March 26, 2012, http://www.aarp.org/health/conditions-treatments/info-03-2012/tennis-elbow-tendinosis-treatment.html. Unlike tendonitis, tendinosis is not characterized by inflammation. *Id.*

[7] Carpal tunnel syndrome affects the wrist and hand, and occurs when too much pressure is put on the nerve running through the wrist to the hands and fingers. Carpal Tunnel Syndrome, UPMC, http://www.upmc.com/patients-visitors/education/orthopaedics/pages/carpal-tunnel-syndrome.aspx. The nerve runs through a passage in the wrist bones, which can become swelled causing nerve irritation. *Id.* The result is pain, numbness, and tingling that can become worse if not properly treated. *Id.* Weakness of loss of strength in the hand may also occur. *Id.*

[8] Mitral valve regurgitation occurs when then heart valve separating the upper and lower chambers of the left side of the heard does not close properly. Michael A. Chen, UPMC, June 4, 2012, http://www.upmc.com/health-library/Pages/ADAM.aspx?GenContentId=000176&ProjectId=1&ProductId=108. It is the most common type of heart valve disorder, and may be caused by high blood pressure or other underlying conditions. *Id.*

chest pain, mild obstructive airway disease,[9] moderate sleep apnea syndrome,[10] mild insomnia, mild hyperlipidemia,[11] mild gastritis,[12] mild hypertension, major depressive disorder,[13] moderate anxiety/panic disorder with agoraphobia,[14] and marijuana abuse. (*Id.*).

Plaintiff's physical capabilities were assessed twice for the purpose of her disability claim—once by non-examining adjudicator Mary Diane Zelenak, and later by treating orthopedic surgeon Dr. Selim El-Attrache. Ms. Zelenak examined Plaintiff's medical records, and determined Plaintiff could occasionally lift twenty pounds, and frequently lift ten pounds. (R. at 176-180). She also determined Plaintiff could stand or walk for a total of about six hours during a work day, sit for about six hours during a work day, and could push or pull without limitation. (*Id.*). Ms. Zelenak's analysis is dated August 10, 2009. (R. at 180). Dr. El-Attrache determined Plaintiff could frequently lift ten pounds or less, occasionally lift twenty pounds, and never lift twenty-five, fifty or one hundred pounds. (R. at 466-467). His report is dated November 4, 2010. (R. at 466).

---

[9] Mild obstructive airway disease includes any respiratory disease characterized by air trapping caused by decreased airway diameter, increased airway secretions, or both. Mosby's Medical Dictionary, 8th ed., Obstructive Airway Disease, 2009, http://medical-dictionary.thefreedictionary.com/obstructive+airway+disease. Emphysema is an example. *Id.*

[10] Sleep apnea is a sleep disorder where the throat collapses intermittently during sleep, which obstructs breathing and disrupts sleep. Sleep Apnea, UPMC, http://www.upmc.com/services/pulmonology/respiratory/conditions/pages/sleep-apnea.aspx.

[11] Hyperlipidemia describes elevated lipid levels in the blood plasma. STEDMAN'S MEDICAL DICTIONARY 922 (28th ed. 2006).

[12] Gastritis is inflammation of the stomach. STEDMAN'S MEDICAL DICTIONARY 790 (28th ed. 2006).

[13] Major depressive disorder is a mood disorder where feelings of sadness loss anger or frustration interfere with everyday life for weeks or longer. Frank K. Berger, MedlinePlus Medical Encyclopedia, March 7, 2012, http://www.nlm.nih.gov/medlineplus/ency/article/000945.htm.

[14] Panic disorder with agoraphobia is an anxiety disorder where a person has attacks of intense fear and anxiety. Timothy Rogge, National Institute of Health, March 25, 2012, http://www.nlm.nih.gov/medlineplus/ency/article/000923.htm. The person will also fear being in places where it is hard to escape, or where help might not be available. *Id.* Agoraphobia usually involves fear of crowds, bridges, or being outside alone. *Id.*

1. *Problems Affecting the Back and Limbs*

i. Degenerative Disc Disease and Spondylosis

On November 7, 2006, Plaintiff underwent an MRI of the lumbar spine at Open MRI of Connellsville. (R. at 209). Dr. Jesus Cenizal reviewed the images and concluded Plaintiff suffered from degenerative disc disease[15] with disc space narrowing. (*Id.*). However, he found no indication of a herniated disc or spinal stenosis.[16] (*Id.*).

Plaintiff had an appointment with her family doctor, Dr. Sarah G. Lumley, on September 23, 2008 to address her back pain. (R. at 281). Dr. Lumley recommended Plaintiff undergo a spinal MRI. (*Id.*). The suggested MRI was performed on the following day, and Dr. Frank Papa analyzed the results. (R. at 219, 221). In the cervical spine, he found significant degenerative disc changes at vertebrae C4-C5. (R. at 219). He also found a very small bulge and small posterior spurs[17] in the same area, which were causing mild narrowing and mild compression on the central spinal canal. (*Id.*). In the thoracic spine, Dr. Papa located degenerative disc changes, a small spur, and a small bulge. (R. at 220). The lumbar spine images revealed very mild narrowing of the central spinal canal, unchanged from a previous exam dated November 7, 2006. (R. at 221). Dr. Papa also observed significant disc changes at vertebrae L5-S1, with small posterior spurs. (*Id.*). No disc herniation was seen in any of the images. (R. at 219-21).

Plaintiff saw Dr. Matthew M. Wetzel on October 2, 2008 at UPMC Department of Neurological Surgery for her upper and lower back pain. (R. at 223). Plaintiff complained that

---

[15] Degenerative disc disease does not describe a disease, but rather the normal changes that spinal discs experience as a person ages. Degenerative Disc Disease - Topic Overview, Healthwise Inc., July 21, 2010, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview.

[16] Stenosis describes a narrowing of any canal or orifice, here, the spinal cord. STEDMAN'S MEDICAL DICTIONARY 1832 (28th ed. 2006).

[17] Bone spurs are smooth structures that form over a prolonged period of time, and do not necessarily cause back pain. John H. Schneider, Spine-Health, http://www.spine-health.com/conditions/arthritis/bone-spurs-osteophytes-and-back-pain. Also called osteophytes, bone spurs are an enlargement of the normal bone structure, and occur with normal age-related spinal degeneration. *Id*. Over the age of 60, bone spurs on the spine are common. *Id*.

her symptoms had become worse over the last two months, and the pain was so severe it made working difficult. (R. at 224). She told Dr. Wetzel that chiropractic care[18] and physical therapy[19] provided only minimal relief, and she was considering applying for Social Security Disability Benefits. (*Id.*). Dr. Wetzel reviewed the MRI of Plaintiff's cervical, thoracic, and lumbar spine, concluding that she suffered from spondylosis throughout the entire back. (*Id.*). He also diagnosed Plaintiff with mild stenosis and degenerative disc disease. (*Id.*). However, Dr. Wetzel concluded that her condition did not warrant surgery at that time. (R. at 225). At this appointment, Plaintiff reported taking Atenolol,[20] Amlodipine,[21] Alprazolam,[22] Simvastatin,[23] and calcium supplements. (R. at 224).

Plaintiff suffered a fall on December 20, 2008, and she went to see Dr. Lumley two days later. (R. at 280). She complained of back pain, but had not gone to the emergency room. (*Id.*). Dr. Lumley diagnosed Plaintiff with chronic neck and back pain and referred her to Dr. Park[24] for pain management, as Dr. Wetzel felt she was not a candidate for surgery. (*Id.*). Following a July 16, 2009 appointment, Dr. Lumley again indicated that Plaintiff suffered from chronic back pain. (R. at 309-10.)

Thereafter, Plaintiff began seeing orthopedic surgeon Dr. El-Attrache for her back problems. (R. at 389). During their first appointment on November 5, 2009, he diagnosed

---

[18] The only records of Chiropractic care come from Dr. David W. Armor. (R. 273). However, Plaintiff's Initial Patient History Summary was not taken until March 12, 2009. (*Id.*).

[19] There is no information available in the record regarding Plaintiff's physical therapy regimen.

[20] Atenolol is used to treat high blood pressure, prevent chest pain, and improve survival after a heart attack. Atenolol, National Institute of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html.

[21] Amlodipine is used alone or with other drugs to treat high blood pressure, and chest pain. Amlodipine, National Institute of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html.

[22] Alprazolam is used to treat anxiety disorders, and panic disorders. Alprazolam, National Institute of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html

[23] Simvastatin is prescribed together with diet, weight-loss, and exercise to reduce fatty substances and bad cholesterol levels in the blood. Simvastatin, National Institute of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html.

[24] This presumably is a reference to Dr. John Park of Rehabilitation and Electrodiagnosis Interventional Spinal Pain Management, who Plaintiff saw regarding carpal tunnel symptoms. (R. at 267).

Plaintiff with degenerative disc disease. (*Id.*). At their next appointment on December 28, 2009, Dr. El-Attrache ordered an x-ray of Plaintiff's cervical spine and determined she had cervical spondylosis. (R. at 383). Dr. El-Attrache also diagnosed Plaintiff with a collapsed disc and general spondylosis of the spine on subsequent encounters.[25] (R. at 349-50, 360, 361, 362, 365, 377, 475, 535). He administered block injections to Plaintiff's lumbosacral spine on two occasions: July 19, 2010, and December 14, 2010. (R. at 361-62, 475).

### ii. Degenerative Arthritis

The earliest diagnosis of arthritis in the record was made by Dr. Lumley, who determined Plaintiff had osteoarthritis with lower back pain on June 24, 2008. (R. 282). On February 26, 2009 Plaintiff underwent a cervical spine MRI at Frick Hospital. (R. at 270). Based on these images, Dr. Michael Mazowiecki located mild to moderate mid-to-lower cervical arthritic changes. (R. at 271). Plaintiff later reported suffering from arthritis on March 12, 2009 at her chiropractic appointment with Dr. David W. Armor. (R. at 275).

An x-ray taken by Dr. El-Attrache in November 2009 revealed multilevel degenerative changes. (R. at 396). Plaintiff was also diagnosed with arthritis, osteoarthritis, and polyosteroarthritis[26] at various follow-ups in 2009 and 2010 by Dr. El-Attrache. (R. at 349-350, 377, 385-87). On June 8, 2009, Dr. Krishnamurty V. Tummalapalli at the Pittsburgh Heart Group noted that Plaintiff "does have arthritis." (R. at 298-99).

### iii. Left Rotator Cuff Tendinosis

Dr. Lumley addressed Plaintiff's complaints of left shoulder pain on October 14, 2009. (R. at 414). She ordered an MRI to investigate Plaintiff's symptoms, which was conducted at an

---

[25] Notably, these diagnoses were often based solely on Plaintiff's description of her own symptoms, and Dr. El-Attrache's physical examination of the Plaintiff. In some cases there is no x-ray or MRI imaging apparent in the record to support the diagnosis.

[26] Polyosteoarthritis describes osteoarthritis that affects many joints. STEDMAN'S MEDICAL DICTIONARY 1533 (28th ed. 2006).

Excella Health facility five days later. (R. at 414, 417). The MRI revealed rotator cuff tendinosis with a possible small partial thickness tear. (R. at 417). The following month, on November 5, Plaintiff had an appointment with Dr. El-Attrache where she again complained of left shoulder pain. (R. at 395). An x-ray was then taken, resulting in a diagnosis of left shoulder cuffitis.[27] Accordingly, Dr. El-Attrache administered a block injection to relieve her symptoms. (*Id.*). He later administered another block injection to Plaintiff's shoulder on November 15, 2010. (R. at 482).

### iv. Carpal Tunnel Syndrome

Plaintiff was seen by Dr. John Park of Rehabilitation and Electrodiagnosis Interventional Spinal Pain Management, on referral from Dr. Lumley, complaining of pain and numbness in her left hand. (R. at 267). After performing a nerve conduction study ("NCS") and electromyogram ("EMG"),[28] Dr. Park determined Plaintiff suffered from mild bilateral carpal tunnel syndrome. (R. at 268). At the time, Plaintiff was taking Atenolol, Xanax,[29] and Zocor.[30] (R. at 267).

### 2. *Gastrointestinal Problems and Cardiac Disease*

Plaintiff has consistently reported chest pain to several different treating physicians over the course of her medical history. From the record, it appears the pain was caused by acid reflux and gastrointestinal problems or was cardiac in nature. She has also been diagnosed with hypertension and hyperlipidemia, both of which are risk factors for cardiac disease.

---

[27] Cuffitis is inflammation of the rotator cuff. STEDMAN'S MEDICAL DICTIONARY 1008 (28th ed. 2006).

[28] An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. Electromyogram (EMG) and Nerve Conduction Studies, Healthwise Inc., http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies Nerve conduction studies measure how well and how fast the nerves can send electrical signals. *Id.*

[29] Also called Alprazolam, Xanax treats anxiety, panic disorder, insomnia, and anxiety-caused depression. Alprazolam, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008896/.

[30] Zocor is another name for Simvastatin. Simvastatin, National Institute of Health, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a692030.html.

### i. Atypical Chest Pain

Plaintiff reported experiencing chest pain on March 20, 2008, during an appointment with Dr. Lumley. (R. at 283). The doctor did not believe the pain was cardiac in nature, but acknowledged that Plaintiff did have multiple cardiac risk factors. (*Id.*). An electrocardiogram ("EKG")[31] was performed in the office, and the results were normal. (*Id.*). On April 8, 2008, Plaintiff was examined for chest pain at Highlands Hospital in Connellsville, Pennsylvania. (R. at 242). Dr. Lumley was the admitting physician, and Dr. Mouhanad Al-Fakih conducted the examination. (*Id.*). Dr. Al-Fakih's report indicated Plaintiff had risk factors for coronary artery disease, including hypertension and high cholesterol. (*Id.*). However, an exercise stress test conducted during the appointment revealed good exercise tolerance with no abnormalities. (R. at 242-43, 250-51, 294-95). Later that year, during an October 2, 2008 meeting with Dr. Wetzel, Plaintiff stated she was not suffering from any chest pain. (R. at 224).

On March 20, 2008, Plaintiff underwent an Upper GI Endoscopy ("EGD")[32] to assess abdominal and chest pain. (R. at 286). The test was conducted at Southwestern Endoscopy Center by Dr. Raji Balu, who prescribed an anti-reflux diet, Aciphex,[33] and recommended a screening colonoscopy. (*Id.*). The chest pain reoccurred, and on March 24, 2008, Plaintiff reported her discomfort was "more than usual" at an office visit with Dr. Lumley. (R. at 283). Dr. Lumley again noted she did not believe the condition to be cardiac in nature. (*Id.*). The

---

[31] An EKG records the heart's electrical activity. What Is an Electrocardiogram? National Hear Lung and Blood Institute, http://www.nhlbi.nih.gov/health/health-topics/topics/ekg/.

[32] An EGD allows the doctor to examine the esophagus, stomach, and duodenum. Upper GI Endoscopy (EGD or Panendoscopy), UPMC, http://www.upmc.com/patients-visitors/education/gastro/pages/upper-gi-endoscopy.aspx It will reveal abnormalities like ulcers or inflammation. *Id.* Small tissue biopsies may also be taken during this exam. *Id.*

[33] Also called Rabeprazole, Aciphex is used to lower the acidity of the stomach. Rabeprazole, U.S. National Library of Medicine, April 1, 2013, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0046047/ #DDIC601511 .side_effects_section. It is used to treat ulcers, and gastroesophageal reflux disease (acid in the stomach moves backward into the esophagus). *Id.*

following month, Dr. Lumley examined Plaintiff once more for chest pain, opining that Plaintiff's anxiety disorder could be causing the discomfort. (R. at 282).

Plaintiff reported experiencing chest pain on March 12, 2009 during her chiropractic appointment with Dr. Armor. (R. at 274). Eight days later, Plaintiff saw Dr. Lumley and she described more discomfort. (R. at 279). Dr. Lumley referred her to Dr. Veerunna Yadagani with the recommendation that he perform a cardiac catheterization in order to better understand Plaintiff's symptoms. (*Id.*).

Dr. Yadagani agreed, and on April 6, 2009 recommended that Plaintiff undergo a right and left heart catheterization in order to determine whether gastritis or cardiac disease was causing the chest symptoms. (R. at 291). In a June 8, 2009 letter to Dr. Lumley, Dr. Tummalapalli also affirmed that the best option was to proceed with a cardiac catheterization in order to definitively diagnose Plaintiff's chest pain. (R. at 298-99, 343-44).

The catheterization procedure was performed by Dr. Tummalapalli on June 19, 2009. (R. at 302-303). Dr. Lumley examined the results on July 16, 2009 and found no abnormalities. (R. at 309-10). Despite the negative catheterization results, Plaintiff continued to report chest discomfort. On August 23, 2010, Dr. Tummalapalli determined Plaintiff's pain was musculoskeletal in nature. (R. at 338-39). The doctor evaluated Plaintiff again on December 14, 2009 and reported that she was still suffering from unexplained chest pain. (R. at 341-42). Accordingly, Dr. Tummalapalli recommended an exercise stress echocardiogram[34] and regular follow-ups. (*Id.*).

Plaintiff submitted to a stress echocardiogram exercise test at Highlands Hospital on January 11, 2010. (R. at 345). Dr. Tummalapalli reviewed the results, and this time found poor

---

[34] An echocardiogram uses sound waves to create a moving image of the heart. Echocardiogram, National Institute of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003869.htm. The picture created is much more detailed than an x-ray, and involves no exposure to radiation. *Id.*

exercise tolerance and severe chest discomfort. (*Id.*). Plaintiff reported chest pain to Dr. Lumley on January 15, 2010, and she recommended that Plaintiff undergo another cardiac catheterization. (R. at 413). UPMC Mercy Cardiovascular Services conducted the second catheterization on January 26, 2010. (R. at 347). The right and left chambers of the heart were involved. (*Id.*). No evidence of significant pulmonary hypertension was found. (R. at 416).

### ii. Mitral Valve Regurgitation

On January 9, 2009, Plaintiff underwent an echocardiogram at Highlands Hospital. (R. at 260, 296). Dr. Albert Enany found evidence of moderate mitral regurgitation. (*Id.*). Three months later, Dr. Yadagani examined the echocardiogram, also finding moderate mitral regurgitation. (R. at 291). Dr. Tummalapalli likewise confirmed this diagnosis on June 8, 2009. (R. 298).

### iii. Gastritis

Plaintiff underwent a duodenum[35] biopsy on March 20, 2009. (R. at 288). The procedure was conducted by Dr. Balu at Uniontown Hospital. (*Id.*). The pre-operation diagnosis was chest pain and acid reflux. (*Id.*). Plaintiff was ultimately diagnosed with mild chronic duodenitis.[36] (*Id.*).

### iv. Hyperlipidemia and Hypertension

Dr. Lumley was the first to treat Plaintiff for hyperlipidemia and hypertension. (R. at 283). On March 20, 2008, the doctor examined Plaintiff and determined her hypertension was well-controlled, that her hyperlipidemia should be tested with blood work, and Plaintiff was given a refill of Simvastatin. (*Id.*). Dr. Lumley later reported on September 23, 2008 that her

---

[35] The duodenum is the first section of the small intestine, and is about 25 centimeters long. STEDMAN'S MEDICAL DICTIONARY 591 (28th ed. 2006).

[36] Duodenitis is inflammation of the duodenum. *Id.*

hypertension was well controlled with Norvasc[37] and Atenolol. (R. at 281). Plaintiff's hyperlipidemia was still under observation, but her Simvastatin had been increased to 40 mg and her progress would be checked with upcoming blood work. (*Id.*).

Dr. Lumley examined Plaintiff on subsequent occasions for these conditions. She opined that Plaintiff suffered from hyperlipidemia (still treated by the increased dosage of Simvastatin, but requiring fasting blood work to check progress) and hypertension (well-controlled) in her write-up of a March 20, 2009 examination. (R. at 279). Dr. Lumley made similar observations on April 24, June 24, September 23, and December 22, 2008, by which time Plaintiff's lipids and hypertension were both well-controlled. (R. at 280-83). Plaintiff's condition remained well-controlled upon examination at subsequent appointments with Dr. Lumley on July 16 and October 14, 2009, as well as January 15, 2010. (R. at 309, 413-14).

Other medical providers arrived at comparable findings. At Highlands Hospital, on April 8, 2008, Dr. Mouhanad Al-Fakih stated in his report that Plaintiff had risk factors for coronary artery disease including hypertension and high cholesterol. (R. at 294). On February 2, 2009, Dr. Yadagani reported Plaintiff suffered from hyperlipidemia. (R. at 292).[38]

### 3. *Mental Health Issues (Major Depressive Disorder, Anxiety/Panic Disorder with Agoraphobia, and Insomnia)*

On September 23, 2008, Dr. Lumley first diagnosed Plaintiff with an anxiety disorder. (R. at 281). She was given Xanax. (*Id.*). On March 20, 2009, Plaintiff again reported experiencing anxiety to Dr. Lumley. (R. at 279). She likewise complained about her nervousness and anxiety to Dr. Armor at her chiropractic appointment on March 23, 2009. (R. at 274). Dr.

---

[37] Norvasc, also called Amlodipine, is prescribed to treat chest pain and high blood pressure. Amlodipine, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0045034/#DDIC600107. side_effects_section.

[38] According to the Initial Patient History Summary taken by Dr. David W. Armor at the Chiropractic Health & Wellness Center in Scottdale, Pennsylvania, Plaintiff reported taking medication for low blood pressure on March 12, 2009. (R. at 273-74). It is unclear whether Plaintiff actually suffered from low blood pressure at that point, or whether this was a mistaken notation.

Lumley confirmed the anxiety disorder diagnosis and prescribed Celexa.[39] (*Id.*). Dr. Lumley stated she could continue taking Xanax, as needed. (*Id.*). Plaintiff repeatedly asserted that she was suffering from anxiety to Dr. Lumley.[40] During a follow-up with Dr. Lumley on July 16, 2009, she was prescribed Ambien.[41] (R. at 309). Plaintiff also reported she had tried taking Celexa every day but expressed that it was "terrible." (*Id.*). At subsequent appointments on October 14, 2009, and January 15, 2010, Dr. Lumley recommended Plaintiff continue Ambien and Xanax, as needed. (R. at 413-14).

Plaintiff began attending sessions at the Chestnut Ridge Counseling Services, Inc. on October 14, 2009. (R. at 465). She regularly saw therapist Cindy Artis and Dr. Padmaja Chilakapati. (R. at 422, 465). During Dr. Chilakapati's initial consultation with Plaintiff, the doctor recorded that Plaintiff had received previous psychiatric care from Dr. Lumley. (R. at 423). As Dr. Lumley's patient, Plaintiff took Zoloft for two years, but became suicidal and was then taken off same. (R. at 423). She then tried a string of different medications, with varying degrees of success. (*Id.*). These antidepressants included: Wellburtin, Effexor XR, Lexapro, and Citalopram. (*Id.*). Plaintiff had no reported suicide attempts. (*Id.*). Dr. Chilakapati diagnosed Plaintiff with panic disorder without agoraphobia,[42] and major depressive disorder. (R. at 424). Plaintiff was ordered to continue taking Citalopram. (R. at 423).

During the Chestnut Ridge sessions, Plaintiff was consistently described by Ms. Artis and Dr. Chilakapati as anxious or depressed. (R. at 420, 429-35, 439-42, 445-46, 448, 450-52, 458, 464-65). Plaintiff first reported suffering from insomnia during her December 12, 2009

---

[39] Celexa is also called Citalopram and is an antidepressant. Citalopram, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0044531/#DDIC600423.side_effects_section.

[40] These included appointments on June 24, 2008, September 23 2008, July 16 2009, and October 14, 2009. (R. at 281-82, 309, 414).

[41] Ambien, also known as Zolpidem, treats insomnia. Aolpidem, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012721/

[42] Plaintiff's complaint avers that she was diagnosed with panic disorder <u>with</u> agoraphobia. (Docket No. 13, at 4).

appointment with Ms. Artis. (R. at 455). Plaintiff thereafter reported suffering insomnia on occasion. (R. at 419, 430-33, 455). During these sessions, Plaintiff sometimes became tearful, and expressed difficulty coping with stress in her life, such as family member illness. (R. at 429, 430, 433, 436, 438, 453). However, on other days, Plaintiff was able to handle stress "pretty well." (R. at 443). Plaintiff described being "happy" when her sister-in-laws visited her, and reported feeling "better" at a session on December 4, 2009. (R. at 454, 455). The last recorded appointment took place on November 16, 2010, the results of which were sent by Chestnut Ridge to Berger and Green. (R. at 420-21).

### 4. *Additional Impairments*

#### i. Mild obstructive airway disease

On January 9, 2009, Plaintiff underwent Spirometry[43] at Highlands Hospital, which revealed a mild airway obstructive lung defect. (R. at 258). Plaintiff stated she had quit smoking one year before, but previously had smoked for thirty five years. (R. at 258, 332).

At Plaintiff's March 20, 2009 visit with Dr. Lumley, the doctor found Plaintiff suffered from chronic obstructive pulmonary disease ("COPD").[44] (R. at 279). The condition was well-controlled with Spiriva[45] and Albuterol.[46] (*Id.*). Dr. Lumley changed Plaintiff's COPD medication on July 16, 2009. (R. 309). At subsequent appointments with Dr. Lumley, on October

---

[43] A Spirometry is a painless study of air volume and flow rates in the lungs. Paula J. Busse, Spirometry, UPMC, *available at* http://emgprddmzvip24457.dmz.upmc.com/health-library/Pages/ADAM.aspx?GenContentId= 1142&ProductId=116&ProjectId=2&ReturnUrl=http%3A%2F%2Femgprddmzvip24457.dmz.upmc.com%2Fhealth-library%2FPages%2FADAM.aspx%3FGenContentId%3D003853%26ProductId%3D116%26ProjectId%3D1.

[44] COPD is one of the most common lung diseases, and makes it difficult to breathe. Chronic obstructive pulmonary disease, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001153/ #adam_000091.disease.causes. Smoking is the leading cause of COPD. *Id.*

[45] Spiriva, or Tiotropium, is used to treat wheezing caused by COPD. Tiotropium, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0045369/#DDIC601347.side_effects_section.

[46] Albuterol is used to prevent and treat wheezing, shortness of breath, coughing, and other symptoms caused by COPD. Albuterol Oral Inhalation, National Institute of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a682145.html.

14, 2009, and January 15, 2010, Dr. Lumley again stated Plaintiff suffered from COPD. (R, at 413-14).

On the mental impairment form sent by Chestnut Ridge to Berger and Green, it was reported that Plaintiff had started smoking again. (R. at 421-22). The report was dated November 12, 2010, when Plaintiff reported smoking half a pack per day. (*Id.*).

### ii. Sleep Apnea

Plaintiff was first examined for sleep disorders at Westmoreland Sleep Medicine by Dr. Bahrat Jain. (R. 328-29). Plaintiff reported waking at least three times a night in order to use the restroom and did not believe she snored or stopped breathing while sleeping. (R. 328). Dr. Jain recommended a full sleep study in order to further evaluate her. (R. at 329).

Plaintiff underwent an initial full sleep study on March 31, 2010, at Fay West Sleep Medicine, in Scottdale Pennsylvania. (R. at 325). Dr. Jain oversaw the procedure, and concluded that Plaintiff had moderate obstructive sleep apnea, and recommended a CPAP machine. (*Id.*). Another sleep study was performed at Fay West on April 1, 2010. (R. at 326). Similarly, Dr. Jain determined from those results that Plaintiff suffered from obstructive sleep apnea syndrome. (*Id.*). Plaintiff submitted to a third sleep study on June 22, 2010 at Westmoreland Sleep Medicine. (R. at 324, 340). Based on the results, Dr. Jain concluded Plaintiff suffered from "significant sleep apnea." (*Id.*). He advised Plaintiff to continue using her CPAP machine. (*Id.*).

### iii. Marijuana Abuse

On January 29, 2009, Plaintiff was sent by Dr. Lumley to Rehabilitation and Electrodiagnosis, Interventional Spinal Pain Management. (R. at 266). A urine test was administered, and it registered positive for marijuana. (R. at 265-66). Dr. Park informed Plaintiff that they would not be taking her on as a new patient due to these results and would only conduct

NCS testing. (R. at 266-67). Plaintiff later denied using marijuana on November 12, 2010, to Dr. Chilakapati during a session at Chestnut Ridge, but admitted to using it when she was "younger." (R. at 422).

C. <u>Administrative Hearing</u>

A hearing regarding Plaintiff's application for SSI was held before ALJ Karl Alexander on February 3, 2011. (R. at 47). Plaintiff appeared with the assistance of her attorney, Linell Lee. (R. at 49-50). An impartial vocational expert also testified. (R. at 49, 78). Plaintiff was born on September 28, 1955, making her fifty five years old at the time of the hearing. (R. at 52). She had applied for disability previously in 2003 and 2004; however, she went back to work because her husband lost his job. (R. at 78).

Plaintiff told the ALJ that she had not worked since September 2, 2008. (R. at 52). At that time she was a cashier and clerk at a drugstore where she passed out prescriptions to customers, lifted cases of drugs, stocked shelves, and did inventory. (R. at 52-53). Prior to that, Plaintiff worked at a grocery store as a clerk and lottery machine attendant. (R. at 58-59). No testimony was elicited regarding Plaintiff's educational background.

Plaintiff answered questions about the physical demands of her past employment, and her physical condition. (R. at 52-59). She claimed that at all of her previous jobs, she had to stand all day because there were rules against sitting down. (R. at 53, 58). She estimated that the heaviest weight she had to lift was approximately twenty pounds. (*Id.*). Plaintiff claimed that she was no longer able to work because she suffered from degenerative disc disease, carpal tunnel, neck pain, problems affecting mobility, mental health issues, and various other ailments. (R. at 54-55, 60, 66).

As to her degenerative disc disease, Plaintiff stated she had suffered from this condition since she was 19. (R. at 55). No surgery was planned to treat the condition. (R. at 64). During testimony, the ALJ reviewed Plaintiff's MRIs and asked about her pain level. (R. at 65-66). She stated that the pain in her neck was "so bad, it's real sharp." (R. at 66). She was given a neck brace by Dr. El-Attrache, but could not remember when he had prescribed it. (*Id.*). Plaintiff's back and neck pain caused her to lay down for about three-fourths of the day. (R. at 69-70). However, she stated she did her own grocery shopping and took her mother every Tuesday to buy supplies. (R. at 70). Plaintiff claimed she was unable to lift a five-pound bag of potatoes, but could lift a gallon of milk with pain and difficulty. (R. at 67).

As to the problems affecting mobility, Plaintiff claimed that pain in her back, shoulder, and neck affected her ability to stand for extended periods of time. (R. at 54). The pain caused her to take unauthorized breaks from work two to three times in a four-hour period. (R. at 56). Plaintiff also reported having trouble sitting for long periods of time. (R. at 59). She further stated that her pain sometimes made bathing difficult. (R. at 74-75). Plaintiff fell in August and was given an ankle brace by Dr. El-Attrache, and again in December, after which Dr. El-Attrache prescribed a cane. (R. at 60). She testified that her falls were caused by ankle problems. (R. at 60-61). Because the falls were recent, the supporting medical records were not yet part of the record, and Plaintiff's attorney stated she would submit them, if possible.[47] (R. at 61).

Regarding her carpal tunnel symptoms, Plaintiff claimed that one reason she stopped working at the drugstore was because her writing had deteriorated. (R. at 53-54). Plaintiff believed carpal tunnel was the cause. (*Id.*). She stated that in 2009 she was prescribed wrist

---

[47] It appears Plaintiff's Counsel did supply the relevant documentation. The record now includes reports from appointments with Dr. El-Attrache on August 16, 2010 and December 14, 2010 where Plaintiff presented with injuries and pain from falls. (R. 353, 475). Plaintiff stated in these reports that the falls occurred on August 6, and December 8, 2010. (*Id.*).

splints by Dr. El-Attrache. (R. at 62-63). The record reflected that she was diagnosed with left and right carpal tunnel syndrome. (R. at 63). Yet, the ALJ noted that there were no supporting documents in the record regarding wrist splints. (R. at 62-63).

Plaintiff also answered questions regarding her mental health. (R. at 68). She reported suffering from anxiety and depression. (R. at 68-69). When working, Plaintiff stated that dealing with customers, coworkers, and supervisors caused her distress; she reported crying at work following an altercation with a superior. (R. at 56-57). She stated that she cried "at least once every day if not more." (R. at 72). Plaintiff testified that her anxiety and depression affected her concentration and memory. (R. at 54, 72). She also spent significant time sleeping or lying down because of her depression,[48] and she reported neglecting her personal hygiene due to depression roughly three times per month. (R. at 73). Plaintiff was under the care of psychiatrist, Dr. Topacca for her depression, and the doctor generally saw her on a monthly basis.[49] (R. at 67-68). Dr. Topacca prescribed Zyloprim to treat Plaintiff's depression. (R. at 68). She stated the medication could be working, but she was not sure. (*Id.*). Her family doctor, Dr. Lumley, prescribed Xanax to treat her anxiety. (R. at 69). Plaintiff testified that this condition caused her to feel upset and nervous and have a rapid heartbeat for twenty minutes or longer.[50] (*Id.*).

Plaintiff also mentioned additional problems that affected her life. For example, she claimed that a "leaky heart valve" caused her arm to go numb during bouts of anxiety. (R. at 69). She mentioned using a CPAP machine, which she claimed was not helping improve her sleep. (R. at 76). Plaintiff also commented that she had asthma. (R. at 77).

---

[48] Plaintiff stated that she spends most of her days in bed both due to her depression and her back pain. (R. at 69-70, 73-74).

[49] This is the phonetic spelling provided from the transcript. It is likely this is in reference to Dr. Chilakapati of Chestnut Ridge Counseling Services. (R. at 465).

[50] Later in her testimony, however, Plaintiff stated her anxiety attacks lasted "anywhere from five to ten minutes sometimes." (R. at 75).

At the conclusion of Plaintiff's testimony, the asked the vocational expert to consider a person with Plaintiff's age, educational background, and work history; who would be able to perform medium work except could not climb ladders, ropes, or scaffolds; should not do any overhead lifting or reaching with the non-dominant left upper extremity; should not be exposed to temperature extremes, wet or humid conditions, environmental pollutants or hazards; should work in a low-stress environment with no production line or assembly type of pace and no independent decision making responsibilities; would be limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors. (R. at 80). Based on these limitations, the ALJ asked the vocational expert if there were any jobs in the regional or national economy that such an individual could perform. (*Id.*). Under the "meeting exertional level,"[51] the vocational expert identified the position of a food prep worker, of which there were 825,000 jobs nationally and 3,300 regionally. (R. at 80). He also identified the position of hand packer, which had 750,000 jobs nationally and 6,200 regionally. (*Id.*).

Plaintiff's counsel then posed a series of other hypothetical questions to the vocational expert. His first assumed a hypothetical person who was required to take unscheduled breaks three or four times per day for five minutes or more. (R. at 81). The vocational expert responded that most employers give a fifteen-minute break during the morning, and another during the afternoon, with some also allowing additional five minute breaks throughout the day. (*Id.*). Plaintiff's counsel clarified that these would be unscheduled breaks, causing the employee to leave his or her workstation without notice. (*Id.*). Given these limitations, the vocational expert concluded that the worker would be off-task more than ten percent of the time and therefore would not be employable. (*Id.*). Plaintiff's counsel's second hypothetical assumed a person who

---

[51] The Court notes that this is likely a typographical error for "medium exertional level."

would be off-task ten percent or more of the time for any reason. (*Id.*). The vocational expert agreed that there would be no jobs for such a person. (R. at 81). Counsel then asked if there were any jobs that could accommodate a person lying down for one hour twice a day during the workday. (R. at 82). The vocational expert again stated there would be no such available jobs. (*Id.*).

    D. <u>The ALJ's Decision</u>

The ALJ ultimately concluded that Plaintiff retained the RFC[52] to perform medium, unskilled work and that there were a significant number of representative jobs available in the national economy which she could perform. (R. at 13-14, 23-24). He began his analysis by first acknowledging that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of October 1, 2008 through her date last insured of March 31, 2010, in accordance with 20 C.F.R. § 404.1571 *et seq*. (R. at 12). Second, the ALJ found that Plaintiff had several medically determinable impairments in accordance with 20 C.F.R. 404.1520(c). (*Id.*). These were degenerative disc disease, degenerative arthritis, spondylosis of the cervical thoracic and lumbar spine, left shoulder rotator cuff tendinosis/degenerative changes, mild bilateral carpal tunnel syndrome, mild or moderate mitral valve regurgitation, complaints of atypical chest pain, mild obstructive airway disease, moderate sleep apnea syndrome, mild insomnia, mild hyperlipidemia, mild gastritis, mild hypertension, major depressive disorder, moderate anxiety/panic disorder with agoraphobia, and cannabis use. (*Id.*). The ALJ determined that Plaintiff's carpal tunnel syndrome, airway disease, insomnia, hyperlipidemia, gastritis, hypertension, and cannabis use imposed at most a minimal functional limitation for a continuous period of twelve months. (R. at 12-13). Although he concluded that these conditions were non-

---

[52] Residual Functional Capacity ("RFC") is the most a social security claimant can still do despite their limitations. 20 C.F.R. § 416.945. This is determined based on the relevant evidence in the case record. *Id.*

severe impairments, he gave Plaintiff the maximum benefit for whatever effect these conditions may have had in combination with the other listed impairments. (R. at 13).

Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subt. P, App'x 1, 20 C.F.R. 404.1520(d), 404.1525, or 404.1526. (*Id.*). In reaching his decision, the ALJ considered medical and other evidence pertaining to Plaintiff's medically determinable impairments in conjunction with all relevant severity criteria. (*Id.*). He also found that Plaintiff's illicit substance use and her mental impairments, whether considered alone or in combination, did not meet or medically equal the necessary criteria. (*Id.*). He added that on August 11, 2009, State Agency Psychiatric Consultant, Dr. Grant W. Croyle, determined Plaintiff's mental impairments to be not severe in nature. (*Id.*).

The ALJ then evaluated Plaintiff's RFC. (R. at 13-14). In doing so, he maintained that he considered Plaintiff's symptoms, the objective medical evidence, opinion evidence, and the credibility of Plaintiff's claims. (R. at 14). He found several inconsistencies which reflected negatively on Plaintiff's credibility. (R. at 15). For example, the ALJ cited Dr. El-Attrache's November 5, 2009 assessment that Plaintiff was in "Good general Health" and Plaintiff's statement to same that injections he had administered improved her pain. (*Id.*). With regard to her mental health, the ALJ referenced Plaintiff's March 26, 2010 assessment by a counselor and Dr. Chilakapati. (*Id.*). Plaintiff had complained to the counselor that she was experiencing anxiety; however, Dr. Chilakapati observed on the same day that Plaintiff was doing well and had been "much more calmer." (*Id.*). The ALJ acknowledged the conclusions reached by Dr. El-Attrache regarding Plaintiff's physical limitations. (R. at 19, 21, 22). However, the ALJ ultimately determined that Dr. El-Attrache's determinations were contradicted by the record as a

whole, based largely on Plaintiff's subjective complaints, and not substantiated by proper imaging tests, and he therefore disregarded them. (*Id.*).

The ALJ therefore concluded that although Plaintiff has medically determinable impairments that could reasonably be expected to cause some of her alleged symptoms, Plaintiff "overstated the severity" of her conditions. (*Id.*). Notably, he found that Plaintiff's use of a cane, neck brace, and arm splints at the hearing demonstrated Plaintiff was "exaggerating her limitations for the purpose of the hearing," especially given the lack of medical evidence in the record supporting her long-term need for such devices. (R. at 23). The ALJ cited several other examples within the record where he found that Plaintiff's description of her symptoms was inconsistent with the objective medical evidence. (R. at 15-22). Plaintiff's varying reports of marijuana use throughout the record were also noted. (R. at 23). Based on his assessment of her credibility and the objective medical evidence, the ALJ concluded that Plaintiff retained the ability to perform medium work activity. (R. at 23).

Next, the ALJ determined Plaintiff had no past relevant work to which she could return. (*Id.*). Last, the ALJ acknowledged that the vocational expert had identified a number of jobs existing in significant numbers in the national economy that someone with Plaintiff's limitations could perform. (*Id.*). Thus, the ALJ found Plaintiff not to be disabled within the meaning of the Act. (R. at 24).[53]

## IV.  STANDARD OF REVIEW

To be eligible for disability benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment, which has lasted or can be expected to last for a

---

[53] The ALJ did, however, recognize that Plaintiff was born on September 28, 1955 and was 54 years old on the date last insured, making her an individual who was closely approaching advanced age according to 20 C.F.R. 404.1563. (R. at 13-14, 23-24).

continuous period of at least twelve months, or which can be expected to result in death. 42 U.S.C. § 423(d)(1)(A); *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999) (citing *Stunkard v. Sec'y of Health and Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988); *see also Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). To determine whether a claimant has met the requirements for disability, the Commissioner must utilize a five-step sequential analysis in reviewing the claim. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1; (4) whether the claimant's impairments prevent her from performing past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a) (4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume past relevant work, the burden shifts to the Commissioner at Step Five to prove that, given the claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Plummer*, 186 F.2d 422 at 428; *see also Doak v. Heckler*, 790 F.2d 26 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[54] 1383(c)(3);[55] *Schaudeck v.*

---

[54] Section 405(g) provides in pertinent part: "Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action… brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business." 42 U.S.C. § 405(g).

*Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a *de novo* review, nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion… so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986).

---

[55] Section 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

## V.    DISCUSSION

Based on the administrative record, the Court finds that the ALJ's "medium" RFC finding is not supported by substantial evidence. "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a) ("Your residual functional capacity is the most you can still do despite your limitations."). An ALJ must consider "all the relevant evidence in [the] case record" when determining an individual's RFC. 20 C.F.R. § 404.1545(a); *see also Burnett,* 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). The ALJ's RFC finding must be "accompanied by a clear and satisfactory explication of the basis on which it rests." *Id.* at 41 (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

In this case, the ALJ determined that Plaintiff had the RFC to perform work at the "medium" level of physical exertion. (R. at 13-14, 23-24). Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c). In evaluating Plaintiff's RFC and finding that she could perform medium work, the ALJ stated that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR. 404.1529 and SSRs 96-4p and SSR

96-7p." (R. at 14). He also claimed to have evaluated opinion evidence "in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-6p and 06-3p." (R. at 14).

Plaintiff, however, contends that she should have been assessed a "light" RFC. (Docket No. 13, at 4). Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). In support of her claims, she argues that the ALJ failed to grant controlling weight to the opinions of her orthopedic surgeon Dr. El-Attrache. (*Id.* at 7). Because Dr. El-Attrache was the only doctor in this case to evaluate Plaintiff's functional capacity, (R. at 466-67), she asserts that the ALJ's decision was erroneous. (Docket No. 13, at 7).

To be sure, the ALJ did consider Dr. El-Attrache's medical findings and diagnoses. However, the ALJ disregarded Dr. El-Attrache's conclusions as inconsistent with the record as a whole, based largely on Plaintiff's subjective complaints, and not substantiated by proper medical imaging tests. (R. at 19, 21, 22). Specifically, he examined Dr. El-Attrache's diagnoses of "Left Trapezius myositis," "Left hand 1st MP joint capsulitis," "Polyosteoarthritis," "Polyarthralgia left > right CTS," "Comorbidity hypertension," and "Left shoulder tenomyositis." (R. at 19). He observed that some of these diagnoses seemed "somewhat isolated and peculiar to Dr. El-Attrache" in light of the remainder of the medical record and "do not seem to have been pursued with any degree of vigorous treatment." (*Id.*). The ALJ further noted that Dr. El-Attrache's findings of polyarthralgia, osteoarthritis, polyosteoarthritis, and tenosynovitis are "without objective support from appropriate imaging studies." (R. at 21). He therefore rejected the diagnoses. (*Id.*).

The ALJ also evaluated and rejected Dr. El-Attrache's medical statement regarding Plaintiff's physical capabilities. (R. at 22, 466). Dr. El-Attrache had concluded that Plaintiff

could frequently lift up to ten pounds, occasionally lift twenty pounds, and never lift over twenty-five, fifty, or over one hundred pounds. (R. at 467). These findings are inconsistent with the ALJ's conclusion that she had a RFC of medium, which contemplates her being able to lift fifty pounds occasionally and twenty-five pounds frequently. 20 C.F.R. § 416.967(c). The ALJ discounted Dr. El-Attrache's findings because they were "inconsistent with the ongoing daily activities conducted by the claimant." (R. at 22). After examining the record in its entirety the ALJ also concluded that the doctor placed too much weight on the Plaintiff's subjective statements in reaching his conclusions. (*Id.*). As the ALJ had already determined that Plaintiff tended to "overstate" her limitations, the ALJ found Dr. El-Attrache's description of her condition "overly severe and inconsistent with the full longitudinal record." (*Id.*). In support, the ALJ referenced Dr. El-Attrache's own report that Plaintiff was in "Good general health." (*Id.*).

Even given the ALJ's unfavorable assessment of Dr. El-Attrache's medical opinions, the ALJ could not disregard them and rely solely on his own medical conclusions, which are unsupported by any physical assessment made by a doctor. An ALJ's RFC assessment must be based on a consideration of all the evidence in the record, including Plaintiff's testimony regarding her daily living activities, medical records, lay evidence, and evidence of pain. *See Burnett*, 220 F.3d at 121-122. "Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant". *Gormont v. Astrue*, Civ. No. 11-2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013) (*citing Doak*, 790 F.2d at 29). Because they are not treating medical professionals, ALJs cannot make medical conclusions in lieu of a physician:

> ALJs, as lay people, are not permitted to substitute their own opinions for opinions of physicians. This rule applies to observations about the claimant's mental as well as physical health. As the Seventh Circuit stated, "[J]udges, including administrative

> law judges of the Social Security Administration, must be careful
> not to succumb to the temptation to play doctor." Accordingly,
> "[a]n ALJ cannot disregard medical evidence simply because it is
> at odds with the ALJ's own unqualified opinion." Nor is the ALJ
> allowed to "play doctor" by using her own lay opinions to fill
> evidentiary gaps in the record.

Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Courts*, § 6:24 (2013) (citations omitted). Federal courts have repeatedly held that an ALJ cannot speculate as to a Plaintiff's RFC; medical evidence speaking to a claimant's functional capabilities that supports the ALJ's conclusion must be invoked. *See, e.g.*, *Zorilla v. Chater,* 915 F. Supp. 662, 667 (S.D.N.Y. 1996) ("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required."); *Woodford v. Apfel,* 93 F. Supp. 2d 521, 529 (S.D.N.Y.2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); *Gormont*, 2013 WL 791455 at *8 (collecting cases). Accordingly, the Third Circuit Court of Appeals has found remand to be appropriate where the ALJ's RFC finding was not supported by a medical assessment of any doctor in the record. *See Doak*, 790 F.2d at 27-29 (directing remand because ALJ's conclusion that the claimant had the RFC to perform light work was not supported by substantial evidence in light of the fact that no physician in the record had suggested that the claimant could perform light work while others had reached different conclusions).

An ALJ is permitted to weigh all evidence in making his finding, and the presence of some record evidence from a treating doctor that is contrary to the ALJ's ultimate decision is not fatal. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (*citing Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986) (providing that an "ALJ is not bound to accept the opinion

or theory of any medical expert, but may weigh the medical evidence and draw its own inferences")); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence.") (citing *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). However, even though an ALJ is not bound to accept the statements of any medical expert, he may not substitute his own judgment for that of a physician. *Kertesz*, 788 F.2d at 163 (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978)).

Like in *Doak*, the record does not disclose any physician who has even suggested that Plaintiff could perform the requisite activities for a medium RFC. On the other hand, at least two individuals did find that she was only capable of light work. As previously noted, Dr. El-Attrache had concluded that she can frequently lift up to ten pounds, occasionally lift twenty pounds, and never lift over twenty-five pounds. (R. at 467). The only other assessment of Plaintiff's physical ability of record was conducted by non-examining adjudicator Ms. Zelenak, who conducted a Physical Residual Functional Capacity Assessment. (R. at 176-180). Ms. Zelenak similarly found that Plaintiff could only lift ten pounds frequently and twenty pounds occasionally. (R. at 177). Both Dr. El-Attrache and Ms. Zelenak's conclusions are consistent with a light work RFC. *See* 20 C.F.R. § 416.967(b).

In discounting both Dr. El-Attrache and Ms. Zelenak's determinations, the ALJ considered the Plaintiff's conditions and demeanor, the diagnoses of other medical doctors, and the raw data in the record. From his own reading of the record, the ALJ apparently concluded, without the relying on the opinion of any other medical professional, that Plaintiff could perform

the requisite amount of work to qualify for a medium RFC. (R. at 16). While the ALJ is permitted to evaluate the credibility of the Plaintiff and weigh the medical evidence presented, he cannot use the record evidence to arrive at his own conclusion regarding her physical capabilities, particularly in the face of a contrary opinion reached by a treating medical doctor. *Kertesz*, 788 F.2d at 163 (citations omitted). It is not enough for the ALJ to provide his reasoning for discounting Dr. El-Attrache's opinions; he must point to some physician who supports his ultimate conclusion that Plaintiff can perform light work. *See Doak*, 790 F.2d at 29. By rejecting Dr. El-Attrache's diagnoses, however dubious they may be, and coming to his own conclusions about Plaintiff's functional capacity, the ALJ impermissibly substituted his own judgment for that of a medical expert.

Although the ALJ appears to have extensively reviewed the record, his decision to disregard Dr. El-Attrache's opinions in order to arrive at his own conclusion about Plaintiff's physical capabilities warrants a remand. Despite providing reasons explaining why he discounted Dr. El-Attrache's finding that Plaintiff was disabled, no other medical opinion exists in the record to support the ALJ's medium RFC finding. No treating physician contradicted Dr. El-Attrache's findings regarding how much Plaintiff could lift. Remarkably, the ALJ also opted to disregard the findings of Ms. Zelenak, the agency's non-examining adjudicator, without explanation. Accordingly, the ALJ's RFC determination of medium was not supported by substantial evidence, and his hypothetical question to the vocational expert pertaining only to an individual with a medium RFC is correspondingly defective.[56] For these reasons, the Court will

---

[56] The ALJ asked the impartial vocational expert to consider:

> [A] hypothetical individual of the claimant's age, educational background, and work history who would be able to perform <u>medium work</u> except could not climb ladders, ropes, or scaffolds; should not do any overhead lifting or reaching with the non-dominant left upper extremity; should not be exposed to

vacate the ALJ's decision and remand the matter pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings as to Plaintiff's proper RFC designation as well as whether she could perform any available jobs in the national economy given her limitations.[57]

## VI. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment is GRANTED, in part, and DENIED, in part; Defendant's Motion for Summary Judgment is DENIED; and this matter is REMANDED for further consideration by the ALJ, consistent with this Memorandum Opinion.

Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   July 24, 2013
cc/ecf: All counsel of record

---

temperature extremes, wet or humid conditions, environmental pollutants or hazards; should work in a low-stress environment with no production line or assembly type of pace and no independent decision making responsibilities; would be limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors.

(R. at 80) (emphasis added).

[57] The Court notes that Plaintiff has advanced an argument that a non-mechanical application of the Grid Rule is appropriate in this case. (Docket No. 13, at 9-11; Docket No. 16, at 1-6). However, because it is unclear whether a person with Plaintiff's limitations can perform any available jobs in the national economy, the Court does not reach the Grid Rule analysis.